**Gary Lynn VESTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–81–0206–CR.**

Court of Appeals of Texas,
Amarillo.

Aug. 5, 1983.

Rehearing Denied Sept. 23, 1983.

Discretionary Review Granted
Feb. 15, 1984.

Mackey K. Hancock and H. Grady Terrill, III, Lubbock, for appellant.

John T. Montford, Dist. Atty. (Court of Appeals), Lubbock, Jim Bob Darnell, Dist. Atty. (Court of Criminal Appeals), Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and COUNTISS, JJ.

DODSON, Justice.

In this case, the jury convicted the appellant of first degree murder on a charge by information and assessed his punishment at confinement for a period of fifty years. Seeking reversal, he brings six grounds of error. By the first three grounds, he challenges the prosecutrix's in-court identification of him, alleging that the pre-trial identification procedure (hypnosis of the prosecutrix) violated his due process rights under the United States Constitution. By the last three grounds, he claims his conviction should be reversed because the State failed to disclose the existence of a ballistics report, cross-examined him concerning a pistol not connected to the alleged offense, and proceeded to trial on an information without a valid waiver of an indictment. After reviewing the record, we conclude that the appellant's challenges to the conviction do not present cause for disturbing the judgment and we affirm his conviction.

On or about 1 April 1978, Robert Rivera was killed in an incident which occurred in Lubbock County. Robert and the prosecutrix were parked in his car on a dirt road approximately one-fourth of a mile east-southeast of the Loop 289 overpass at East 19th Street, in southeast Lubbock. While Robert and the prosecutrix were sitting in the car, two men came to the scene. One of the men killed Robert and raped the prosecutrix. At a pretrial suppression hearing and at the trial, the prosecutrix

identified the appellant as Robert's assailant and her rapist.

By his first three grounds of error and relying primarily on *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and other similar cases, the appellant claims that his right to due process under the Fourteenth Amendment to the United States Constitution was violated because the pre-trial identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. He further maintains that the State failed to show by clear and convincing evidence that the prosecutrix's in-court identification of him was of independent origin, rather than the result of unnecessarily suggestive pre-trial identification procedures.

Among other things, the record shows that during the late afternoon and early evening hours of 31 March 1978, the prosecutrix was at home with her sisters. During that period, she drank two beers prior to a 7:30 p.m. supper, and opened a third beer after the meal. At approximately 10:00 p.m., the deceased, Robert Rios Rivera, "came by" the prosecutrix's house and asked her to go with him to the liquor store. After a short conversation, the prosecutrix changed her clothes and accompanied the deceased to "Jordan's" on 4th Street, on the east side of Lubbock; she was still drinking her third beer of the day. At Jordan's they purchased two six packs of beer and then headed back towards the city on the same road. The prosecutrix testified that she drank one of the beers from the two six packs and that she thought the deceased drank two during the course of the evening.

After stopping on a dirt road for the deceased to "use the restroom," the couple drove to "a store there on East Broadway" in order to purchase some cigarettes. They then drove out East 19th away from town, just outside of Loop 289. The deceased parked the car on a dirt road amidst "a bunch of trees" and in sight of Loop 289. The prosecutrix and the deceased eventually moved to the back seat where they engaged in sexual intercourse.

After intercourse, the deceased "got out of the car to use the restroom" and the prosecutrix dressed and returned to the front seat. The deceased then asked her to get into the back seat with him again, and began to do so himself. The prosecutrix testified that, at that moment, "[s]omebody hollered in the back [behind the car], 'get out you Mexicans.'" The deceased was sitting on the driver's side of the back seat. The prosecutrix, thinking it might be the police, said, "who is it?" She testified that the deceased then said, "you b_____ m_____ f_____s," or something to that effect. The prosecutrix further stated that she could not yet see anyone outside the car but observed that the appellant had been shot "in the mouth."

A man, whom she later identified as the appellant, then told the prosecutrix to "get in the back seat." The prosecutrix "jumped in the back seat" after which she saw the appellant insert a pistol-ladened hand through the lowered portion of the back window and again shoot the deceased. The deceased slumped over the prosecutrix who was, by this time, screaming and crying. The prosecutrix then crawled over the deceased's body, exited the car on the driver's side and faced the two men standing outside the automobile. She testified that the appellant walked toward her until she could see his face and ordered her to walk in front of him "to where the tree was." The appellant then raped the prosecutrix. During the progress of the rape, the other man (appellant's companion) was, as the prosecutrix stated, "throwing Robert [the deceased] out of the car."

After the rape, the appellant forced the prosecutrix to walk in front of him back to the car while the other man removed the clothes from the body of the deceased. The prosecutrix stated at trial that she first saw the other man's face when he "was telling the one that raped me [the prosecutrix] he had to get rid of me." The other man then told her to take the deceased's

watch off; she complied and gave the watch to him (appellant's companion). The appellant and the other man then discussed whether they should also kill the prosecutrix. Taking no such action at that time, the men gave the prosecutrix her clothes (she had been clothed when the two men arrived but was forced to strip when she was raped). The men also gave her the deceased's boots (one of her shoes had been lost), but again talked about whether or not to "get rid" of her. The appellant then stated that he was going to let her go and that "if [she] told, he would get [her] anyway." After additional threats from both men, the prosecutrix was told to "start walking." She began to walk, but had not gotten far when the appellant called her back. She complied with appellant's order to return, and again stood face to face with him. The prosecutrix was crying and begging the appellant not to hurt her; he finally told her to "keep walking and don't turn back."

The prosecutrix then "walked several ways" and saw the two men drive off in the deceased's car. She walked and ran until she came to some houses, where she was assisted and the Sheriff was summoned. Deputies Keesee and Bohannon arrived at the house where the prosecutrix was and, after calming her somewhat, took her back to help find the scene of the crime. At this point (i.e. the early morning hours of 1 April 1978), the Lubbock County Sheriff's Office "processed" the scene and began its investigation.

Deputy Keesee testified that, a day or two after the offense, he "took [the prosecutrix] to the Lubbock Police Department. They pulled their mug shots of the known violent criminals and she was unable to pick out one." Deputy Keesee further testified, however, that to his knowledge, the appellant's picture was not present in any of the mug books viewed by the prosecutrix. Approximately one week after the incident, Deputy Barclay requested the prosecutrix to look through a group of pictures to determine if there was a photograph of either of the two men in the stack. She went through the stack and stopped at the appellant's picture. She responded, "That's him," or "I think that's him," "That looks like him," or words to that effect. The deputy then asked her, "What do you mean that looks like him?" She answered, "That's him." The deputy further inquired, "Are you positive?" She said, "I'm almost positive."

Deputy Barclay testified that he arranged to have the prosecutrix hypnotized hoping to "confirm the identification a little further" and to "[g]et her settled down where she could, maybe recall a few more details" of the incident. On 18 May 1978, a hypnotic session was conducted by Travis McPherson, the Sheriff of Deaf Smith County, Texas, a trained forensic hypnotist. The hypnotic session was conducted at the D.P.S. offices in Lubbock. The prosecutrix did not know that McPherson was a law enforcement officer. Deputy Barclay gave McPherson a group of pictures (estimated at five) to use in the hypnotic session. However, he did not relate to McPherson the details of the incident nor the suspect's name nor picture. Deputy Barclay, Texas Ranger Joe Hunt and D.P.S. polygraph operator, Ron Rogers, observed the hypnotic session through a two-way mirror and heard the dialogue through a sound system.

The tape of the hypnotic session reveals that after a rather lengthy process of placing her in an "hypnotic state," the prosecutrix recounted several details of the events of the evening of the incident. Concerning identification, McPherson tried without success to build a composite drawing of Robert's assailant and the prosecutrix's rapist. While the prosecutrix was in the "hypnotic state" McPherson asked her to fix the assailant's image in her mind's eye. Then he would ask her to open her eyes and view one of the photos from the array for identification purposes. When the prosecutrix saw the appellant's picture, she identified him as Robert's assailant and her rapist.

The tape further reveals that the prosecutrix had a cough at the time of the hypnotic session. On numerous occasions dur-

ing the session, the prosecutrix's hacking cough erupted and disturbed her "hypnotic state." After each coughing episode, McPherson would attempt to restore the prosecutrix's "hypnotic state" by asking her to take a drink of "lemonade," telling her to relax and encouraging her "to go deeper." At the conclusion of the session and after the prosecutrix had been brought out of the hypnotic state, she repeated her identification of the appellant.

At a later date and in an effort to enhance the prosecutrix's memory regarding the role and identity of the co-defendant, McPherson again attempted to hypnotize her, but was unsuccessful because her "hacking cough" repeatedly defeated the Sheriff's efforts. At a final hypnotic session, which is essentially unrelated to the case before us, McPherson conducted a session concerning the co-defendant.

The appellant filed a motion to suppress the prosecutrix's identification alleging, among other things, that it resulted from undue suggestions placed in the prosecutrix's mind at the time of the hypnotic session. After listening to both the testimony presented at the hearing on the motion to suppress and the tape of the hypnotic session in question, the trial court overruled the appellant's motion to suppress the prosecutrix's in-court identification. In denying the motion, the court found that the prosecutrix's identification of the appellant "was of independent origin and was an independent recollection of the Defendant [appellant] at the time of the alleged occurrence in question." The court further concluded the prosecutrix's identification was not tainted nor impermissibly suggested by photographic lineups or by the hypnotic procedure or session, and that the procedure did not "give rise to 'a very substantial likelihood of irreparable misidentification.'"

In his initial brief under the first three grounds of error, the appellant's challenge to the in-court identification is primarily directed at an 18 May 1978 hypnotic session, conducted by the Deaf Smith County Sheriff, and the photo display at that session. By supplemental brief and relying on *People v. Shirley*, 31 Cal.3d 18, 641 P.2d 775, 181 Cal.Rptr. 243 (1982), the appellant vigorously contends that all of the prosecutrix's in-court identification testimony should have been excluded because the witness previously had undergone hypnosis for the purpose of restoring her memory of the events in issue. In *Shirley*, the court held "that the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward."

Consequently, as the case before us is postured, our inquiry is limited to a determination of whether the appellant's due process rights under the Fourteenth Amendment of the United States Constitution were violated because the prosecutrix had undergone hypnosis before she made her in-court identification. In this regard, we note that at this time neither the United States Supreme Court nor the Texas Court of Criminal Appeals has addressed the situation presented in this instance. We further acknowledge that in *Burnett v. State*, 642 S.W.2d 765, 769 (Tex.Cr.App.1982), the court determined that the State could not introduce a tape recording of an hypnotic session between the defendant and the hypnotist because the tape was the work product of defendant's counsel. That situation, however, is not before us.

Our review of the authorities from other jurisdictions reveals that a majority of the courts which have considered the questions presented by post-hypnotic testimony favors its admission.[1] A minority (*i.e.* six

1. *See United States v. Awkard*, 597 F.2d 667 (9th Cir.1979), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Adams*, 581 F.2d 193 (9th Cir.1978), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *People v. Smrekar*, 68 Ill. App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978); *State v. Brom*, 8 Or.App. 598,

jurisdictions) excludes the testimony.[2] In general, the majority has adopted either the "credibility" or the "guideline" approach. The minority has adopted the *per se* exclusionary rule.

*People v. Shirley, supra,* relied on by the appellant, exemplifies the *per se* exclusionary rule. In that case, the defendant was accused of raping the complaining witness. The defendant's identity was not an issue at the trial, nor was the use of hypnosis as an investigatory identification process. The central issue was whether the defendant had consensual intercourse with the complaining witness or whether he had raped her by threats and force. On the eve of the trial, the witness was hypnotized by a Deputy District Attorney to enhance her memory of the events in question. The defendant's conviction was grounded on the witness' non-consent testimony at the trial.

Relying on certain medical opinion testimony in the record and professional literature, the court concluded that in the fields of medicine and psychiatry, hypnosis has not gained general acceptance as an accurate aid to memory recall without undue danger of distortions, delusions and fantasy by hypnotized subjects, and that hypnosis is unduly suggestive and intrinsically unreliable. In reaching its conclusion that the testimony of a witness who had previously undergone hypnosis was unreliable, the *Shirley* court applied its version of the *Frye* rule. *See Frye v. United States,* 293 Fed. 1013 (D.C.Cir.1923).[3]

In summary, the *Shirley* court equated the testimony of a previously hypnotized witness to evidence based on polygraph examinations, truth serum, nalline testing, experimental systems of blood typing, voiceprint analysis, microscopic identification of gunshot residue particles and other evidence "developed by" or "based on" new scientific techniques. The court also found that the professional literature and medical testimony before it demonstrated "beyond any doubt that at the present time the use of hypnosis to restore the memory of a potential witness is not generally accepted as reliable by the relevant scientific community," and excluded the testimony. However, in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981) (*i.e.* the guideline approach), the court reached a contrary conclusion and rejected the *per se* exclusionary rule.

In *Hurd,* the court determined that the State failed to meet its burden of establishing by clear and convincing evidence the admissibility of the proffered identification testimony after it had been established that the crime victim had undergone hypnosis to refresh her memory. Before hypnosis, the crime victim had been unwilling or unable to make an identification of the crime perpetrator.

In rejecting the *per se* exclusionary rule, and adopting a strict safeguards rule, the court stated:

> [W]e believe *that a rule of per se inadmissibility is unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony.* Without underestimating the seriousness of the problems associated with hypnosis, *it should be recog-*

---

494 P.2d 434 (1972); *State v. Jorgensen,* 8 Or. App. 1, 492 P.2d 312 (1971).

**2.** *See State v. Mack,* 292 N.W.2d 764, 765 (Minn. 1980); *State v. Mena,* 128 Ariz. 226, 232, 624 P.2d 1274, 1279–80 (1981); *State v. La Mountain,* 125 Ariz. 547, 551, 611 P.2d 551, 555 (1980); *People v. Shirley,* 31 Cal.3d 18, 54, 641 P.2d 775, 796, 181 Cal.Rptr. 243, 265, *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982) (No. 82–78); *Polk v. State,* 48 Md.App. 382, 394–96, 427 A.2d 1041, 1048–49 (Ct.Spec. App.1981); *People v. Tait,* 99 Mich.App. 19, 28, 297 N.W.2d 853, 857 (Ct.App.1980); and *People*

*v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (New York Court of Appeals, 1983).

**3.** In *Frye,* the government sought to introduce expert opinion testimony deduced from the results of a systolic blood pressure deception test. The court determined that the testimony was inadmissible. From *Frye* evolved the general rule that the admissibility of testimony based on the results of a new or experimental scientific technique is conditioned on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed.

*nized that psychological research concerning the reliability of ordinary eyewitnesses reveals similar shortcomings.* (Emphasis supplied). *Id.* 432 A.2d at 94.

Applying its version of the *Frye* rule, the court stated:

> Based on the evidence submitted at trial, we are satisfied that the use of hypnosis to refresh memory satisfies the *Frye* standard in certain instances. If it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory. *Id.* at 92.

Recognizing the problems raised by the use of hypnosis, the court held that, subject to *strict safeguards* to ensure the reliability of the *hypnotic procedure,* such testimony is admissible.[4]

Under the credibility approach the courts conclude that the prior hypnosis affects the weight not the admissibility of the testimony.[5] That approach has not gained a widespread following. Although the credibility approach presents a simple solution to the admissibility question, it does not directly deal with the constitutional issues relating to post-hypnotic testimony.

After reviewing the three approaches used by the courts from other jurisdictions, we are not persuaded that those approaches present the proper solution to the admissibility questions before us. In our view, the *per se* exclusionary rule is unnecessarily broad and results in the exclusion of evidence that is as trustworthy as other eyewitness testimony. In this regard, we observe that the United States Supreme Court has expressed its reluctance to apply *per se* exclusionary rules to investigative identification processes. *See Manson v. Brathwaite,* 432 U.S. 98, 113, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977). In *Manson,* the Court stated: "Certainly, inflexible rules of exclusion, that may frustrate rather than promote justice, have not been viewed recently by this Court with unlimited enthusiasm." In this instance, we share that court's lack of enthusiasm for rigid rules of exclusion.

Under the strict safeguards approach, the investigative use of hypnosis is required to be conducted in a vacuum by personnel usually untrained in the investigation of crime. In our view, that approach is a notable example of judicial overkill, which is unworkable and impractical and which will eventually lead to total exclusion as other well-meaning courts make additional safeguards. For other criticisms of the safeguard approach, see *Shirley,* 641 P.2d at 786–88, 181 Cal.Rptr. at 254–57. We further note that the effect of the decisions of the courts that follow the strict safeguard approach and the *per se* exclusionary rule, is to extend to the accused greater rights than those provided by the United States Supreme Court in other investigative identification cases.[6]

In declining to follow the approaches used by courts from other jurisdictions, we acknowledge that use of hypnosis as an

4. The strict safeguards adopted by the *Hurd* court are summarized as follows: (1) the hypnotist must be a psychiatrist or psychologist experienced in the use of hypnosis; (2) to avoid bias, the hypnotist must be independent of the prosecution and defense; (3) all information the police or defense give the hypnotist before the session must be recorded in some suitable form; (4) before the session the subject must describe in detail to the hypnotist the facts as he remembers them, and the hypnotist must avoid influencing that description; (5) all contacts between the hypnotist and the subject—*i.e.,* the prehypnotic examination, the hypnotic session, and the posthypnotic interrogation—must be recorded, preferably on videotape; and (6) no person other than the hypnotist and the subject may be present during the session, including the preh- ypnotic examination and the posthypnotic interrogation.

5. *United States v. Awkard,* 597 F.2d 667 (9th Cir.1979), *cert. denied,* 444 U.S. 885 (1979); *United States v. Adams,* 581 F.2d 193 (9th Cir. 1978), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

6. In *People v. Hughes,* 59 N.Y.2d 523 at p. 542, 466 N.Y.S.2d 255, 453 N.E.2d 484 (New York Court of Appeals, 1983), when the court adopted the *per se* exclusion rule (where the identification witness had undergone hypnosis), the court candidly admitted that it was providing the accused with greater rights than those provided by the United States Supreme Court in other investigative identification cases.

investigative identification process presents a potential danger for misuse.[7] We conclude, however, that the constitutional issues presented in this instance should be resolved by principles established by the United States Supreme Court for dealing with the questions presented by other investigative identification processes. By elevating certain investigative identification processes to constitutional dimensions, the United States Supreme Court has recognized that most identification procedures have a potential danger for misuse and for producing unreliable testimony. Accordingly, the Supreme Court has established well defined principles to deal with those investigative identification processes. *See Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

■ Various expressions are utilized in the United States Supreme Court cases to describe the test for determining whether the in-court identification is admissible despite some impropriety in the investigative identification process. Among these are: (1) whether there is an "independent origin" of the in-court identification, *Wade*, 388 U.S. at 242, 87 S.Ct. at 1940; and *Gilbert*, 388 U.S. at 272, 87 S.Ct. at 1956; (2) whether the "totality of the circumstances surrounding" the pre-trial identification demonstrates a violation of due process, *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972; (3) whether there is a "substantial likelihood of misidentification," *Simmons*,

390 U.S. at 384, 88 S.Ct. at 971; *Biggers*, 409 U.S. at 201, 93 S.Ct. at 383; and *Manson*, 432 U.S. at 107, 97 S.Ct at 2249; and (4) whether the identification is "reliable," *Manson*, 432 U.S. at 114, 97 S.Ct at 2253. In this connection, it is clear that an improper or unnecessarily suggestive lineup, showup, or photographic display does not *per se* require the suppression of an in-court identification. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). As stated in *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253, "reliability is the linchpin in determining the admissibility of [in-court] identification testimony."

■ Following the above stated principles, we conclude that post-hypnotic identification testimony is admissible where the totality of the circumstances surrounding the hypnotic session shows that the session was not so impermissibly suggestive as to give rise to a substantial likelihood of an unreliable or misidentification. Under that conclusion, the circumstances presented in the record before us show that the pre-trial identification processes were not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Moreover, the record reveals clear and convincing evidence that the prosecutrix's in-court identification was of independent origin. It follows, therefore, that the prosecutrix's in-court identification of the appellant is reliable.

The record shows that the prosecutrix was a witness to and a victim of a vicious

---

7. For a discussion of problems concerning hypnotic testimony, see Note, *The Use of Hypnosis to Refresh Memory: Invaluable Tool or Dangerous Device*, 60 Wash.U.L.Q. 1059 (1982); Note, *The Admissibility of Testimony Influenced by Hypnosis*, 67 Va.L.Rev. 1203 (1981); Note, *Hypnotically Enhanced Testimony in Criminal Trials: Current Trends and Rationales*, 19 Hous.

765 (1982); Note, *Awakening from the Exclusionary Trance: A Balancing Approach to the Admissibility of Hypnotically Refreshed Testimony*, 61 Tex.L.Rev. 719 (1982); and Falk, *Posthypnotic Testimony—Witness Competency and the Fulcrum of Procedural Safeguards*, 57 St. John's L.Rev. 30 (1982).

criminal episode. The episode spanned a considerable length of time and the prosecutrix had ample opportunity to observe the perpetrators of the offense. The prosecutrix, the deputies and Allen Johnson from the National Weather Service all testified that although the offense occurred in the middle of the night, visibility ranged from adequate to good. The evidence further shows that the offense occurred approximately one-fourth of a mile off Loop 289. Deputy Bohannon was at the scene shortly after the offense occurred. He testified: "The lighting was—it was fairly light due to the lights from the loop. If I remember correctly, there was a quarter moon, but it was fairly light." The prosecutrix stated that she observed the appellant for a "long time." This testimony is born out by the extended events of the criminal episode (*i.e.* the murder, several orders, the removal of her clothes, the rape, the theft of Robert's watch, a discussion between the perpetrators as to the prosecutrix's fate, her aborted walk away from them, her return, another discussion concerning her fate, and finally their last order to "keep walking").

The evidence further shows that she was very close to the appellant on several occasions during the episode. The prosecutrix was no more than a few feet from the appellant when he stuck his arm in the car window and shot Robert the second time. She was face to face with the appellant when he raped her. She further stated that she could see the faces of both men clearly when they discussed killing her. The testimony also shows that after the offense on 1 April 1978, she consistently identified the appellant on 8 April 1978, in the photographic array with Deputy Barclay, on 18 May 1978, during the hypnotic session, in late January or early February of 1979, during the police lineup, and again in April of 1979 during the motion to suppress hearing, and finally at the trial.

The record also contains several unequivocal statements made at the suppression hearing and at trial showing the independent origin of the prosecutrix's in-court identification. In response to an inquiry as to why she felt her testimony was untainted by the hypnotic session, the prosecutrix stated: "I remember this man real well. He's the one that killed Robert and he's the one that raped me. I just remember him well." When asked "if you had not been placed under hypnosis, do you think your memory would have come back?" she replied, "I would still remembered [*sic*] it." In this regard, we particularly note that the record shows that before she was hypnotized, the prosecutrix identified the appellant from the photo display approximately one week after the offense occurred and before she was hypnotized. She never varied from that identification.

The appellant nevertheless argues that the hypnotic session was unduly suggestive because (1) McPherson asked leading questions which suggested the answers he wanted to hear, and (2) that at the conclusion of the session and before McPherson brought the prosecutrix out of the hypnotic state, he told her that she would be able to identify the defendant (the appellant). In context, McPherson told the prosecutrix that she would be able to identify the perpetrator of the offense from her mind's eye picture of the person who shot Robert. However, the tape reveals that he did not tell the prosecutrix that she would be able to identify the appellant or any other person as the perpetrator of the crime. Thus, we conclude that comment was not impermissibly suggestive.

Concerning the leading question, we observe in general that such questions invariably appear in most question and answer dialogues between two persons. In this instance, the tape reveals that the prosecutrix was not prone to suggestion and answered numerous questions in a manner contradictory to the "suggested answer." Furthermore, after listening to the tape of the hypnotic session, we are not convinced that McPherson lead the prosecutrix to identify the appellant as the perpetrator of the crime, nor are we convinced that he did so by direct, indirect or subtle suggestions.

The appellant, however, advances several other arguments to support his contention that the State failed to establish by clear and convincing evidence that the prosecutrix's in-court identification was reliable and of independent origin. He first claims that a composite drawing of the alleged offender bears little or no resemblance to him. Although we do not agree with the appellant's assertion, the admissibility of the prosecutrix's in-court identification does not rest on the ability of the witness and the officers to make a composite drawing that resembles the accused. He next maintains that the identification is unreliable because at the trial the prosecutrix identified a picture of the co-defendant as the appellant. This is a matter that goes to the weight of the identification testimony rather than its admissibility.

The appellant further claims the testimony is unreliable because more than ten months elapsed between the offense and the lineup identification. In this regard, the record offers no explanation for the delay. However, the record does show that the prosecutrix did identify the appellant at the lineup and that the lineup was the prosecutrix's first opportunity to view the appellant since the date of the offense. Under the circumstances, we are not persuaded that the delay discredits the prosecutrix's identification. Nor are we persuaded that the delay can be credited to the prosecutrix's prior actions concerning the identification of the perpetrator of the offense (*i.e.* she identified the appellant's picture one week after the offense).

The appellant next claims that the prosecutrix did not have an adequate opportunity to observe the actors. We disagree. The record shows that the prosecutrix had ample time and numerous opportunities to observe the appellant during the criminal episode. Appellant further says the prosecutrix was inattentive during the offense because she was intoxicated at the time. Although the record shows the prosecutrix had consumed three or four beers over an *eight or nine hour period immediately pre-*ceding the offense, there is no testimony by the investigating officers indicating the prosecutrix was intoxicated. Furthermore, the prosecutrix's testimony details events sufficiently severe to direct her attention to the acts and the perpetrators of them.

Lastly, the appellant contends that the identification is unreliable because after the hypnotic sessions had concluded the prosecutrix questioned an old picture of the appellant by asking, "Is that the same one?" The record shows that the picture questioned was taken of the appellant approximately two years before the date of the offense. When this matter is considered in light of the other circumstances, it does not render the identification unreliable.

■ We further acknowledge that by the second ground of error, the appellant claims that the trial court erred in failing and refusing to suppress the prosecutrix's in-court identification because the pre-trial photographic display was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification in violation of his rights of confrontation and due process under the Sixth and Fourteenth Amendments to the United States Constitution. We have addressed the due process challenge under the Fourteenth Amendment. The right of confrontation challenge under the Sixth Amendment is not before us. That challenge was not presented to the trial court by the appellant in his motion to suppress. Nor did he object on that ground at the trial, when the challenged evidence was introduced. Under those circumstances, the confrontation challenge presents nothing for review. *See Darland v. State,* 582 S.W.2d 452, 454–55 (Tex.Cr.App.1979). Consequently and for the reasons stated above, the appellant's first, second and third grounds of error are overruled.

■ By his fourth ground of error, the appellant claims that his conviction should be reversed because the State's counsel violated the trial court's order granting appellant's Motion for Discovery, by failing and refusing to disclose to him the existence of a ballistics report showing that a

pistol which the State attempted to link to him could not have been the murder weapon. The record shows that there was no ballistics report to turn over to the appellant.

The matter complained of under this ground of error arose out of a conversation between Mark McBride, one of the prosecuting attorneys, and Grady Terrill, one of appellant's trial lawyers, concerning a .38 caliber pistol allegedly owned by appellant's father, Maurice Vester, Sr. According to Mr. Terrill's testimony given in a hearing on a Motion for New Trial, McBride told him (some time after the guilty verdict was returned) that Deputy Bohannon had informed him (McBride) the police had taken the gun "from either Maurice Vester, Sr., or his wife, had tested the gun, a .38 caliber detective special [and] had returned the gun three or four days later. It was not the murder weapon. It didn't match up."

At the same hearing, McBride testified basically that he had been mistaken when he related the above information to Terrill and that "[t]hrough my [McBride's] investigation today I have learned that my conversation to you [Terrill] yesterday, the contents thereof, were incorrect." McBride went on to state that between the time of the conversation with Terrill and the hearing on appellant's Motion for New Trial, he had spoken with Deputy Bohannon and had found that he (McBride) had been mistaken. According to the testimony of Deputy Bohannon, he had never recovered a .38 caliber weapon from anyone connected with the Vester family, and consequently had never had occasion to test such a weapon. The core of the prosecution's testimony in this matter is essentially that no .38 caliber pistol was ever recovered from Maurice Vester, Sr. and, resultantly, there was never a ballistics report on such a weapon. There was, therefore, nothing to turn over to defense counsel. The appellant's fourth ground of error is overruled.

■ By his fifth ground of error, the appellant contends that his conviction

should be reversed because "The State's counsel exhibited bad faith prejudicial to this appellant by cross-examining him about a certain pistol and then implying to the jury that it was the murder weapon when the cross-examination was bottomed on hearsay several times removed and was calculated to prejudice appellant." By this ground of error, the appellant complains about (1) a question proposed by Rick Howell, one of the prosecuting attorneys, to the appellant, concerning his "daddy's .38 Detective Special," and (2) Howell's jury argument, also in connection with the elder Vester's gun.

The appellant challenges the following cross-examination:

Q. [By Mr. Howell] Okay. What about your daddy's .38 Detective Special, you remember that gun, don't you?

A. [Appellant] Yes.

Q. Okay. Do you know where it is now?

A. Well, I don't know where it is, but I know one thing, I was the one that missed it off.

Q. Pardon me?

A. I was the one that lost it, I'll put it like that.

Q. Lost it? Okay.

So, he did have a gun, didn't he?

A. Yes.

Q. When did you loose [*sic*] it?

A. It was—it was after this had happened, though, and I lost it out at Uncle Nasty's.

and the following jury argument:

[Mr. Howell] How could she [the prosecutrix] know that the Vester's [*sic*] had— well, I don't know how many .38 pistols they had. I will let you be the judge of all of that pistol testimony.

But, how could she know that—you recall on voir dire, I ask [*sic*] you to look at the way a person answer [*sic*] a question. What we call demeanor evidence. And, I hope you were looking at Gary Lynn Vester when I asked him about that .38 pistol.

The appellant argues that the State's counsel exercised bad faith by examining him about his father's pistol because the prosecutor knew the State had no murder weapon and that at the time the State's counsel asked him about the pistol, the counsel believed from hearsay information that the State had a ballistics test proving that the pistol was not the murder weapon. For reversal, the appellant relies on *Cavender v. State*, 547 S.W.2d 601 (Tex.Cr.App. 1977).

In *Cavender*, the prosecutor questioned the defendant concerning an alleged extra-judicial confession made by the defendant to his mother. The prosecutor asked: "Frank, as a matter of fact, you told your own mother that you went into that house and stabbed and raped your aunt; isn't that true?" To which the defendant replied: "That is negative, sir." The prosecutor further asserted: "Not only that, but your mother has told your uncle Paul [husband of deceased] that; isn't that the reason that he is—" The defendant answered: "That is a lie, sir." The prosecutor, however, further queried: "Isn't that the reason that he is so angry?" At that point in the dialogue, the defendant's counsel stated to the Court: "Your Honor, I will ask for a mistrial unless he has some real evidence in his file to support that and not—" The prosecutor immediately responded "I have all the real evidence in the file that Counsel needs, if he wants it." The trial court overruled the motion for mistrial, but instructed the jury to disregard the questions.

At the conclusion of the defendant's (Cavender's) testimony and out of the presence of the jury, the defendant's counsel asked the court to inquire into the prosecutor's good faith in asking the questions. The trial court's inquiry revealed that the questions were bottomed on hearsay several times removed. The defendant renewed his motion for mistrial urging that the prosecutor had not established a basis for asking the questions. His motion was overruled.

On appeal, the Court of Criminal Appeals stated:

This Court rarely reversed a conviction of crime solely because an improper question was propounded to the defendant as a witness. To cause reversal, the question must be obviously harmful to the defendant. [Citations omitted].

Further, any error in asking an improper question or in admitting improper testimony may be generally cured or rendered harmless by a withdrawal of such testimony and an instruction to disregard. The exception to this general rule occurs where it appears that the question or the evidence is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds. [Citations omitted]. *Id.* at 603.

The Court of Criminal Appeals reversed the case because:

*The prosecutor's question*, coupled with his statement that he had all the evidence in the file, *was clearly calculated to inflame the minds of the jury, and we find same to be so harmful and prejudicial to appellant that the impression produced on the minds of the jury could not be withdrawn by the court's instruction.* (Emphasis supplied). *Id.*

In the present case, we conclude that the questions propounded to the appellant were not so harmful and prejudicial to the appellant that the impression produced on the minds of the jury could not have been withdrawn by a proper instruction to disregard. The questions to the appellant in this instance do not elevate to the same level as the questions in *Cavender* regarding the asserted extra-judicial confession by the defendant and real evidence in the prosecutor's file to backup the assertion.

■ Concerning jury argument, it is well settled that an objection and a request for an instruction to disregard are required to preserve error, unless the challenged argument is so inflammatory that its prejudicial effect can not be alleviated by in-

struction. *Stokes v. State,* 506 S.W.2d 860 (Tex.Cr.App.1974), and *Thomas v. State,* 468 S.W.2d 90 (Tex.Cr.App.1971). In the present case, the challenged argument could have been cured by a proper objection and instruction to disregard. However, the record before us, fails to show any objection, request for an instruction to disregard or a motion for mistrial, in response to either the challenged cross-examination or the prosecutor's argument. Consequently, the appellant's fifth ground of error presents nothing for review.

 Concerning his failure to object and request an instruction to disregard, the appellant, by supplemental brief, argues that his failure to object to the challenged cross-examination and jury argument is excused because he did not know that the prosecution had exercised bad faith until after the trial was concluded. He further contends that in his motion for new trial, he exercised his first opportunity to object. In this connection and without passing on the appellant's bad faith assertion, it is sufficient to state that we are not persuaded that the dialogue between the appellant's counsel and the State prosecutor vitiated the appellant's obligation to object to the challenged cross-examination and jury argument on other proper and sustainable grounds and to request proper instructions to disregard the same. The appellant's fifth ground of error is overruled.

By his last ground of error, the appellant claims the trial court proceeded to trial without jurisdiction because there is no indictment in this case. In this regard, the appellant acknowledges that he signed a document entitled "Waiver of Indictment" and "Approval of the Court." However, he argues that the waiver does not comply with the requirements of article 1.141, Tex.Code Crim.Pro.Ann. (Vernon 1977), and that to be effective, the waiver must be intelligently, voluntarily and knowingly given by him while represented by counsel.

Article 1.141 of the Texas Code of Criminal Procedure provides:

A person represented by legal counsel may in open court or by written instrument voluntarily waive the right to be accused by indictment of any offense other than a capital felony. On waiver as provided in this article, the accused shall be charged by information.

In the present case, the instrument styled "Waiver of Indictment" shows that the appellant was represented by counsel, understood his rights and waived prosecution by indictment. Appellant and his attorney signed the waiver and it was approved by the trial court. Consequently, the record evidences that the appellant's intelligent, voluntary and knowing waiver of his right to be accused by indictment was in compliance with article 1.141 of the Texas Code of Criminal Procedure. *See Ex parte Hunter,* 604 S.W.2d 188, 190 (Tex.Cr. App.1980), and *Garrett v. State,* 625 S.W.2d 809 (Tex.App.—Houston [14th Dist.] 1981, no pet'n). Appellant's sixth ground of error is overruled.

In summary, the appellant's six grounds of error are overruled and his conviction is affirmed.