Gary Lynn VESTER, Appellant,

v.

The STATE of Texas, Appellee.

No. 1017–83.

Court of Criminal Appeals of Texas, En Banc.

April 23, 1986.

Mackey Hancock, H. Grady Terrill, III, Ralph H. Brock, Lubbock, for appellant.

John T. Montford, Former Dist. Atty., Jim Bob Darnell, Dist. Atty., Ruth Cantrell, Asst. Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

This is an appeal from a jury conviction for first degree murder. Punishment assessed by the jury was for a period of fifty years.

On appeal the appellant, inter alia, urged that the trial court erred in failing to suppress the prosecutrix's in-court identification, alleging that the pre-trial identification procedure (hypnosis of the prosecutrix) violated his due process rights under the United States Constitution. The Amarillo Court of Appeals affirmed the conviction. *Vester v. State,* 684 S.W.2d 715 (Tex.App. —Amarillo 1983).

We granted appellant's petition for discretionary review to consider the following claims. First, whether the Court of Appeals erred in holding that the prosecutrix's in-court identification was of independent origin and not as a result of hypnotically-induced testimony resulting from unnecessarily suggestive pre-trial identification procedures. Second, whether the Court of Appeals erred in holding that hypnotically-induced testimony is admissible in Texas. Our resolution of the first ground of error makes it unnecessary to address the second ground of error at this time. We affirm appellant's conviction.

The evidence at trial showed that in the afternoon of March 31, 1978, the prosecutrix, Edelia Ybarra, bought a six pack of beer on her way home from picking up her

sisters from school. She drank two of those beers prior to a 7:30 p.m. supper, and opened up a third beer after supper. At around 10 p.m., the deceased, Robert Rios Rivera, came around for Ybarra. The two of them carried on a conversation "for a while," with the deceased asking Ybarra to accompany him to the liquor store. After changing clothes, Ybarra went with the deceased in his car to the liquor store. She was still drinking her third beer of the day. At the liquor store they purchased two six packs of beer, and then got back in the car and headed back the way they had come. Ybarra testified that during the course of the evening she drank one of the beers from the two six packs and that she thought the deceased drank two.

After stopping on a dirt road for the deceased to "use the restroom," the couple drove "to a store there on East Broadway" to purchase some cigarettes. They then drove out East 19th, just outside Loop 289, to a dirt road. The deceased turned down this dirt road and parked "by a bunch of trees." Ybarra could see the Loop from where they parked. The prosecutrix and the deceased eventually engaged in sexual intercourse in the front seat.

After intercourse, the deceased got out of the car to use the restroom. Upon his return, the deceased got into the back seat of the car and asked Ybarra to do the same. At that point, Ybarra testified that "somebody hollered in the back, 'get out you Mexicans.'" Ybarra, thinking it was the police, asked "Who is it?" She testified that the deceased then said, "you b____ m____ F____s, or something like that." She further stated that at this time she could not see anyone outside the car but observed that the deceased had been shot "in the mouth."

A man, whom she later identified as the appellant, then told Ybarra to "get in the back seat," which she did. Ybarra could see the appellant's face through the rear window when he approached the car and stuck a gun through the window. Appellant was 10 inches from the prosecutrix at this time.

The appellant shot the deceased again, causing the deceased to slump over Ybarra who was, by this time, screaming and crying. The prosecutrix then crawled over the deceased's body, exited the car on the driver's side and faced the two men standing outside the automobile, the appellant being "right in front of [her]." The appellant then told Ybarra to walk in front of him "to where the tree was." Having complied, the appellant then raped the prosecutrix. During the rape, the prosecutrix could see appellant's face, there being no camouflage. The other man at this time was throwing the deceased out of the car.

After the rape, the appellant forced the prosecutrix to walk in front of him back to the car, while the other man removed the clothes from the body of the deceased. The prosecutrix stated at trial that she first saw the other man's face when he "was telling the one that raped me [the prosecutrix] he had to get rid of me." That man then told Ybarra to take the deceased's watch off, which she did, giving it to that man (appellant's companion). The appellant and the other man then discussed killing the prosecutrix. Taking no action at that time, appellant's companion handed the prosecutrix her clothes, as she was still unclothed at that time, having been forced to strip when she was raped.

The two men once again discussed "getting rid" of the prosecutrix. During the discussion, both men's faces were clearly visible to appellant. The appellant then stated that he was going to let the prosecutrix go, but "that if [she] told, he would get [her] anyway." After additional threats from both men, the prosecutrix was told to "start walking." She began to walk away, but had not gotten far when the appellant called her back. Complying with appellant's order, she again stood face to face with him. After the prosecutrix cried and begged the appellant not to hurt her, he told her to "keep walking and don't turn back."

The prosecutrix then "walked several ways" and saw the two men drive off in the deceased's car. She walked and ran

until she came to some houses, where she was assisted and the Sheriff was summoned. Deputies Keesee and Bohanon arrived at the house where the prosecutrix was and, after calming her somewhat, took her to help find the scene of the crime. At this point (the early morning hours of April 1, 1978), the Lubbock County Sheriff's office "processed" the scene and began its investigation.

Deputy Keesee testified that, a day or two after the offense, he "took [the prosecutrix] to the Lubbock Police Department. They pulled their mug shots of the known violent criminals and she was unable to pick out one." Deputy Keesee further testified, however, that to his knowledge, the appellant's picture was not present in any of the mug books viewed by the prosecutrix.

Approximately one week after the incident, Deputy Barclay requested the prosecutrix to look through a group of pictures to determine if there was a photograph of either of the two men in the stack. She went through the stack and stopped at the appellant's picture. She responded, "That's him," or "I think that's him," "That looks like him," or words to that effect. The deputy then asked her, "What do you mean that looks like him?" She answered, "That's him." The deputy further inquired, "Are you positive?" She said, "I'm almost positive."

Deputy Barclay testified that he arranged to have the prosecutrix hypnotized hoping to "confirm the identification a little further" and to "[g]et her settled down where she could, maybe recall a few more details" of the incident. On May 18, 1978, a hypnotic session was conducted by Travis McPherson, the Sheriff of Deaf Smith County, Texas, and a trained forensic hypnotist. The session took place at the D.P.S. offices in Lubbock. The prosecutrix did not know that McPherson, who was dressed in plain clothes, was a law enforcement officer. Deputy Barclay gave McPherson a group of about five pictures to use in the hypnotic session. However, he did not relate to McPherson the details

of the incident, the suspect's name or his picture. Deputy Barclay, Texas Ranger Joe Hunt and D.P.S. polygraph operator, Ron Rogers, observed the hypnotic session through a two-way mirror and heard the dialogue through a sound system.

The tape of the hypnotic session reveals that after a rather lengthy process of placing her in an "hypnotic state," the prosecutrix recounted several details of the events of the evening of the incident. Concerning identification, McPherson tried without success to build a composite drawing of Robert's assailant and the prosecutrix's rapist. While the prosecutrix was in the "hypnotic state" McPherson asked her to fix the assailant's image in her mind's eye. Then he would ask her to open her eyes and view one of the photos from the array for identification purposes. When the prosecutrix saw the appellant's picture, she identified him as the deceased's assailant and her rapist.

The tape further reveals that the prosecutrix had a cough at the time of the hypnotic session. On numerous occasions during the session, the prosecutrix's hacking cough erupted and disturbed her "hypnotic state." After each coughing episode, McPherson would attempt to restore the prosecutrix's "hypnotic state" by asking her to take a drink of "lemonade," telling her to relax and encouraging her "to go deeper." At the conclusion of the session and after the prosecutrix had been brought out of the hypnotic state, she repeated her identification of the appellant.

At a later date and in an effort to enhance the prosecutrix's memory regarding the role and identity of the co-defendant, McPherson again attempted to hypnotize her, but was unsuccessful because her "hacking cough" repeatedly defeated his efforts. At a final hypnotic session, which is essentially unrelated to the case before us, McPherson conducted a session concerning the co-defendant.

The appellant filed a motion to suppress the prosecutrix's identification alleging, inter alia, that it resulted from undue suggestions placed in the prosecutrix's mind at

the time of the hypnotic session. After listening to both the testimony presented at the hearing on the motion to suppress and the tape of the hypnotic session in question, the trial court overruled the appellant's motion to suppress the prosecutrix's in-court identification. In denying the motion, the court found that the prosecutrix's identification of the appellant "was of independent origin and was an independent recollection of the Defendant [appellant] at the time of the alleged occurrence in question." The court further concluded that the prosecutrix's identification was not tainted nor impermissibly suggested by the photographic lineups of the hypnotic procedure or sessions, and that the procedure did not "give rise to a 'very substantial likelihood or irreparable misidentification.'"

■ Appellant vigorously contends that all of the prosecutrix's in-court identification testimony should be excluded because she (the prosecutrix) had previously undergone hypnosis for the purpose of restoring her memory of the events in issue. Appellant relies upon *People v. Shirley,* 31 Cal.3d 18, 641 P.2d 775, 181 Cal.Rptr. 243 (1982), in support of such contention.

That reliance is misplaced. In *Shirley,* the court held "that the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, *from the time of the hypnotic session forward.*" 641 P.2d at 804, 181 Cal.Rptr. at 252.[1] That court said nothing regarding testimony as it related to identification *prior* to any hypnotic session.

The United States Supreme Court in an evolution of cases has described the following test for determining whether the in-court identification is admissible: (1) whether there is an "independent origin" of the in-court identification, *United States v. Wade,* 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967); *Gilbert v. United States,* 388 U.S. 263, 272, 87 S.Ct.

1951, 1956, 18 L.Ed.2d 1178 (1967); (2) whether the "totality of the circumstances surrounding" the pre-trial identification demonstrates a violation of due process, *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); (3) whether there is a "substantial likelihood of misidentification," *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 107, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977) and (4) whether the identification is "reliable," reliability being "the linchpin in determining the admissibility of [in-court] identification testimony." *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253.

Following the above stated principles, we conclude that the prosecutrix's in-court identification of appellant was admissible. The circumstances presented in the record before us reveal that the pre-trial identification process was not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Furthermore, the record reveals clear and convincing evidence that the prosecutrix's in-court identification was of independent origin. It follows, therefore, that the prosecutrix's in-court identification of appellant is reliable.

The record shows that the prosecutrix was a witness and a victim to a vicious criminal episode, which spanned a considerable length of time giving the prosecutrix ample opportunity to observe the perpetrators of the offense. The prosecutrix, the deputies and Allen Johnson from the National Weather Service all testified that although the offense occurred in the early morning hours, visibility ranged from adequate to good. The evidence further reveals that the offense occurred approximately one-fourth of a mile off Loop 289. Deputy Bohanon was at the scene shortly after the offense occurred. He testified: "The lighting was—it was fairly light due to the lights from the loop. If I remember correctly, there was a quarter moon, but it

---

1. Emphasis mine unless otherwise noted.

was fairly light." The prosecutrix stated that she observed the appellant for a "long time." This testimony is supported by the extended events of the criminal episode (i.e., the murder, several orders, the removal of the prosecutrix's clothes, the rape, the theft of the deceased's watch, a discussion between the perpetrators as to the prosecutrix's fate, her aborted walk away from them, her return, another discussion concerning her fate, and finally their last order to "keep walking").

The evidence further shows that the prosecutrix was very close to appellant on several occasions during the episode. The prosecutrix was 10 inches from appellant when he stuck his arm in the car window and shot the deceased the second time. She was face to face with appellant when he raped her. She further testified that she could see the faces of both men clearly when they discussed killing her, with the prosecutrix standing face to face with appellant during the second discussion of her fate.

The testimony reflects that the prosecutrix identified appellant one week after the offense in a photographic array with Deputy Barclay. She never varied from that identification. There is nothing in the record to reflect that the "photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. at 383, 88 S.Ct. at 970, 19 L.Ed.2d at 1253. See also *Stovall v. United States*, supra. Deputy Barclay handed the prosecutrix a stack of photographs and merely asked her to look through them to see if she could identify any of them. At no time did Barclay suggest that a suspect was amongst those photographs, or make any other such impermissibly suggestive remark.

The record also contains several unequivocal statements made at the suppression hearing and at trial showing the independent origin of the prosecutrix's in-court identification. In response to an inquiry as to why she felt her testimony was untainted by the hypnotic session, the prosecutrix stated: "I remember this man well. He's the one that killed Robert [the deceased] and he's the one that raped me. I just remember him well." When asked "if you had not been placed under hypnosis, do you think your memory would have come back?", she replied, "I would still remember it." Considering that the prosecutrix identified appellant one week after the offense, never varied from that identification and that such identification was prior to any hypnosis, we find much credence in such statements by her.

We therefore conclude that the prosecutrix's in-court identification had an independent origin from the hypnosis sessions, and the circumstances surrounding that initial pre-hypnosis identification reveals reliability. Such identification is admissible.

■ As stated previously, at this time we do not reach the issue of whether hypnotically-induced testimony is admissible in Texas. The fact that such testimony was admitted in appellant's case was not harmful, if indeed it was error at all, because it was merely cumulative of already reliable identification testimony.

We therefore affirm the Court of Appeals' affirmance of appellant's conviction, while not expressly adopting its entire rationale.

CLINTON, Judge, concurring.

In his petition for discretionary review appellant asserts, in ground for review no. 1: "The Court of Appeals erred in holding that hypnotically-induced testimony is admissible in Texas." This states too broadly, however, what I understand to be the holding of the court of appeals. Appellant refers us to a number of cases which address admissibility of hypnotically enhanced memory under the socalled *Frye* rule, a version of which this Court has previously adopted to exclude testimony as to the results of polygraph and "truth serum" tests. Though the court of appeals mentioned some of these cases in its analysis, it expressly limited its holding to encompass admissibility as a function of due

process, and did not decide the broader evidentiary question. Nor would I, and hence I concur with the majority's conclusion that we do not have to reach this issue.

Regarding appellant's due process claim I would hold that appellant failed to sustain the burden of establishing impermissible suggestiveness during the May 18 hypnotic session. Accordingly, I would not reach the question of whether the evidence reveals an "independent origin" for the in-court identification.

## I.

### A.

As a valid psychotherapeutic device hypnosis has long been accepted in the medical and scientific communities. American Medical Association: *Medical Use of Hypnosis. JAMA* 1958; 168: 186–189. In the therapeutic setting, however, the value of hypnosis is in no way contingent upon the historical accuracy of the memory that may come to light thereunder. Not so uniformly accepted is the use of hypnosis as a means of "refreshing" memory reliable enough to be vented in the criminal adversarial process. See American Medical Association: *Scientific Status of Refreshing Recollection by the Use of Hypnosis. JAMA* 1985; 253: 1918–1923, wherein it is recommended that "[t]he use of hypnosis with witnesses and victims to enhance recall should be limited to the investigative process[,]" and even then, should be subject to certain delineated safeguards, *id.*, at 1922–1923, designed to minimize the latent suggestiveness that is inherent in the phenomenon of hypnosis.

Proponents of the use of hypnosis to restore a crime victim's memory to facilitate his trial testimony, most notable of whom is Dr. Martin Reiser, a psychologist and forensic hypnotist with the Los Angeles Police Department, advocate a "videotape recorder" theory of human memory. By this theory the human mind is thought to receive and store in the subconscious every bit of data taken in by the senses.

Hypnosis is regarded as a legitimate vehicle for tapping the subconscious to retrieve data recorded therein which has proven to be inaccessible to the subject's conscious memory. "The assumption, however, that a process analogous to a multichannel videotape recorder inside the head records all sensory impressions and stores them in their pristine form indefinitely is not consistent with research findings or with current theories of memory." *Id.*, at 1920. Currently accepted theories of memory deem it to be a reconstructive process as much as reproductive. Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int.J. Clinical Experimental Hypnosis 311, 321 (1979). The problem with hypnosis which sets it apart from other methods of "refreshing" a witness' memory is that it tends greatly to facilitate not only the retrieval of genuinely remembered data, but also construction of false but nevertheless plausible data to fill in gaps in true memory. Moreover, once this "confabulation" takes place, neither expert nor jury nor even the witness himself can differentiate historical fact from fantasy.

The Supreme Court of California, in its recent exhaustive opinion in *People v. Shirley,* 31 Cal.3d 18, 641 P.2d 775, 181 Cal. Rptr. 243 (1982), *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982), after a review of the pertinent professional literature on the subject, aptly identified and articulated the dangers of using hypnosis to "restore" the memory of an eyewitness or victim, thus:

"1. Hypnosis is by its nature a process of suggestion, and one of its primary effects is that the person hypnotized becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The effect is intensified by another characteristic of the hypnotic state, to wit, that the attention of the subject is wholly focused on and directed by the hypnotist. The suggestions may take the form of explicit requests or predictions by the hypnotist; or they may be inferred by the subject from information he acquired prior to or during the hypnotic session, or from such

cues as the known purpose of that session, the form of questions asked or comments made by the hypnotist, or the hypnotist's demeanor and other nonverbal conduct. The suggestions can be entirely unintended—indeed, unperceived—by the hypnotist himself.

2. The person under hypnosis experiences a compelling desire to please the hypnotist by reacting positively to these suggestions, and hence to produce the particular responses he believes are expected of him. Because of this compulsion, when asked to recall an event either while in 'age regression' or under direct suggestion of heightened memory ('hypermnesia'), he is unwilling to admit that he cannot do so or that his recollection is uncertain or incomplete. Instead, he will produce a 'memory' of the event that may be compounded of (1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized material ('confabulations') unconsciously invented to fill gaps in the story, and (4) conscious lies— all formulated in as realistic a fashion as he can. The likelihood of such self-deception is increased by another effect of hypnosis, i.e., that it significantly impairs the subject's critical judgment and causes him to give credence to memories so vague and fragmentary that he would not have relied on them before being hypnotized.

3. During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudomemories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial), neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction. In each instance, if the claimed memory is not or cannot be verified by wholly independent means, no one can reliably tell whether it is an accurate recollection or mere confabulation. Because of the foregoing pressures on the subject to present the hypnotist with a logically complete and satisfying memory of the prior event, neither the detail, coherence, nor plausibility of the resulting recall is any guarantee of its veracity.

4. Nor is such guarantee furnished by the confidence with which the memory is initially reported or subsequently related: a witness who is uncertain of his recollections before being hypnotized will become convinced by that process that the story he told under hypnosis is true and correct in every respect. This effect is enhanced by two techniques commonly used by lay hypnotists: before being hypnotized the subject is told (or believes) that hypnosis will help him to 'remember very clearly everything that happened' in the prior event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively. Further enhancement of this effect often occurs when, after he returns to the waking state, the subject remembers the content of his new 'memory' but forgets its source, i.e., forgets that he acquired it during the hypnotic session ('posthypnotic source amnesia'); this phenomenon can arise spontaneously from the subject's expectations as to the nature and effects of hypnosis, or can be unwittingly suggested by the hypnotist's instructions. Finally, the effect not only persists, but the witness' conviction of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story; by the time of trial, the resulting 'memory' may be so fixed in his mind that traditional legal techniques such as cross-examination may be largely ineffective to expose its unreliability. [Footnotes omitted.]"

*Id.,* 641 P.2d at 802–804, 181 Cal.Rptr. at 270–272. See also generally Orne, *The Use and Misuse of Hypnosis in Court,* supra; Diamond, *Inherent Problems in the Use Of Pretrial Hypnosis on a Prospective Witness,* 68 Cal.L.Rev. 313, 332–334 (1980); Mickenberg, *Mesmerizing Justice: The Use of Hypnotically-Induced Testimony in Criminal Trials,* 34 Syracuse L.Rev. 927, 951–952 (1983); Note, *Hypnotically*

*Enhanced Testimony in Criminal Trials: Current Trends and Rationales,* 19 Hous. L.Rev. 765, 774–777 (1982); *United States v. Valdez,* 722 F.2d 1196, 1201–1202 (CA5 1984).

In short:

"Review of the scientific literature indicates that when hypnosis is used to refresh recollection, one of the following outcomes occurs: (1) hypnosis produces recollections that are not substantially different from nonhypnotic recollections; (2) it yields recollections that are more inaccurate than nonhypnotic memory; or, most frequently, (3) it results in more information being reported, but these recollections contain both accurate and inaccurate details. When the third condition results, the individual is less likely to be able to discriminate between accurate and inaccurate recollections. There are no data to support a fourth alternative, namely, that hypnosis increases remembering of only accurate information."

American Medical Association: *Scientific Status of Refreshing Recollection by the Use of Hypnosis. JAMA,* supra, at 1921.

### B.

Review of the cases since 1980 from the various jurisdictions which have dealt with the question of the admissibility of incourt identification testimony from a witness whose memory has been hypnotically enhanced reveals that such testimony has been assailed on essentially three legal bases. The first and most prevalent of these is the claim that such testimony should be excluded because it fails to meet the criterion set out in *Frye v. United States,* 54 App.D.C. 46, 293 Fed. 1013 (D.C.Cir.1923), wherein it was held that "while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.,* at 1014. Almost every court which has reviewed the question of the admissibility of hypnotically enhanced testimony since 1980 has at least addressed *Frye.*

Accordingly, some courts have admitted hypnotically enhanced testimony, subject to certain mandatory procedural "safeguards," on the assumption that when these safeguards are followed, hypnosis will yield memory "comparable to normal recall in its accuracy."[1] Many other courts have admitted testimony derived

---

1. In *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981) the Supreme Court of New Jersey held that "hypnotically-induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy." *Id.,* at 92. In establishing reliability, the proponent must show by clear and convincing evidence compliance with the following guidelines, which the New Jersey court adopted from Orne, *The Use and Misuse of Hypnosis in Court,* supra:

"First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed. Although we recognize that there are many other people trained to administer hypnosis and skilled in its use for investigative purposes, we believe that a professional must administer hypnosis if the testimony revealed is to be used in a criminal trial. In this way, the court will be able to obtain vital information concerning the pathological reason for memory loss and the hypnotizability of the witness. Furthermore, the expert will be able to conduct the interrogation in a manner most likely to yield accurate recall.

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. [footnote omitted] This condition will safeguard against any bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. This requirement will help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking

from perceptions demonstrated to have been recalled by the witness *prior* to hypnosis, but have excluded testimony as to any matter "remembered" only during or after the hypnotic session.[2] At least one jurisdiction to date has judged any witness hypnotized in order to enhance his recall of certain events to be incompetent to testify as to any matter concerning those events, regardless of whether it can be demonstrated that he recalled those events prior to the hypnosis.[3] A handful of jurisdictions continue to adhere to the position that the reliability of hypnotically enhanced tes-

> structured questions or adding new details. [Emphasis in original]
>
> Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post hypnotic period, enabling a court to determine what information or suggestions the witness may have received during the session and what recall was first elicited through hypnosis. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.
>
> Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the posthypnotic interview. Although it may be easier for a person familiar with the investigation to conduct some of the questioning, the risk of undetectable, inadvertent suggestion is too great, as this case illustrates. Likewise, the mere presence of such a person may influence the response of the subject."

*Id.,* at 96–97. See also *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (1982); *State v. Weston,* 16 Ohio App.3d 279, 475 N.E.2d 805 (1984). If these safeguards are established, "the testimony is admissible [and] the opponent may still challenge the reliability of the particular procedures followed in the individual case by introducing expert testimony at trial, but the opponent may not attempt to prove the general unreliability of hypnosis." *Hurd,* supra, 432 A.2d at 95.

Notable about the *Hurd* court's application of the *Frye* rule is its emphasis upon establishing the reliability of hypnosis as a means of "restoring memory comparable to normal recall in its accuracy." One commentator has observed, however:

> "The failings of the *Hurd* safeguards can be traced to a basic flaw in the court's application of *Frye.* By simply requiring that hypnosis produce results comparable in accuracy to normal recall, the court ignores the fact that the hypnotic process itself is not comparable to normal means of refreshing memory. The problems of fantasy, confabulation, and hypersuggestibility are peculiar to the hypnotic state and cannot be eliminated or controlled. It is, therefore, impossible to determine in any given case whether hypnosis has produced memories comparably accurate to normal recall, or whether it has produced wild fantasy. A recognition of the fundamental differences between the process of hypnosis and the process of normal means of refreshing recollection has therefore led the majority of jurisdictions to apply the *Frye* standards in a more meaningful fashion. [footnote omitted] Rather than merely asking whether hypnosis is generally accepted as a means of refreshing memory, these jurisdictions have required proponents of hypnotically-induced evidence to show that hypnotism is generally accepted as a means of *accurately* refreshing memory." [Emphasis in original.]

Mickenberg, *Mesmerizing Justice: The Use of Hypnotically-Induced Testimony in Criminal Trials,* supra, at 965. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

2. This position seems to have gained momentum in the past several years, and has been deemed the "emerging consensus." *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 263, 453 N.E.2d 484, 492 (1983), quoting *State v. Wren,* 425 So.2d 756, 760 (La.1983). See *State v. Moreno,* 709 P.2d 103 (Haw.1985); *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985); *People v. Nixon,* 421 Mich. 79, 364 N.W.2d 593 (Mich.1984); *State v. Flack,* 312 N.C. 448, 322 S.E.2d 758 (1984); *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984); *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651 (1984); *Commonwealth v. Smoyer,* 505 Pa. 83, 476 A.2d 1304 (1984); *Robison v. State,* 677 P.2d 1080 (Okla. Crim.App.1984), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984); *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983); *Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190 (1983); *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983); *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982).

3. Though the majority does not so interpret it, see Maj.op. at p. 923, the holding of *People v. Shirley,* 31 Cal.3d 18, 641 P.2d 775, 181 Cal.Rptr. 243 (1982), *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982), is that a hypnotized witness is rendered *incompetent* to testify as to any matter brought out during the hypnotic session, regardless of whether he had any prehypnotic memory of that matter. Such witness *could* testify, however, as to anything not discussed under hypnosis. This is apparently the rule in Minnesota as well. See *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *State v. Blanchard,* 315 N.W.2d 427 (Minn.1982).

timony is primarily a question of weight and credibility rather than admissibility, and expressly refuse to apply *Frye* at all.[4] This Court has relied upon a *Frye* analysis to exclude testimony of the results of polygraph tests, see *Romero v. State*, 493 S.W.2d 206 (Tex.Cr.App.1974), and of amytal sodium or "truth serum" tests, see *Cain v. State*, 549 S.W.2d 707 (Tex.Cr.App. 1977). To date the Court has not passed upon the admissibility of hypnotically enhanced testimony in this context.

A second attack to which hypnotic testimony may be vulnerable derives from the Sixth Amendment to the United States Constitution. It is argued that because hypnosis has the effect, *inter alia*, of rendering what may previously have been a tentative identification practically certain in the mind of the witness, the accused is effectively deprived of the ability to cross-examine him on his incourt identification.[5] Though appellant raised this point in his brief to the court of appeals, that court dismissed it because it had not been expressly raised in the trial court. *Vester v. State*, 684 S.W.2d 715, 724 (Ct.App.— Amarillo 1983).

The third attack on hypnotically enhanced testimony reflected in the cases is that the hypnotic session was so unduly suggestive a procedure as to render any identification of the accused made thereunder violative of his due process rights under the Fourteenth Amendment to the United States Constitution, and that any incourt identification following that procedure would be tainted evidence. The court of appeals determined that in the instant case only this particular issue was before it, *Vester v. State*, supra, at 719, and in my view the record bears this out.

### C.

In his motion to suppress the testimony of Edelia Ybarra appellant raised only the issue of a violation of due process. At the pretrial *"Martinez"*[6] hearing, as it was designated by appellant's trial counsel, the question of scientific acceptance, *vel non*, of hypnosis as a means of refreshing a witness' memory was not broached. Dr. Alvin J. Cronson, a psychiatrist testifying on behalf of appellant, and Mathias Stricherz, a psychologist testifying for the State, simply disagreed as to the degree of suggestiveness to which Ybarra had been subjected during the hypnotic session on May 18. The level of acceptance hypnosis has gained in the relevant scientific community as a reliable catalyst to memory was not addressed by either witness.[7] Nor

---

**4.** A few jurisdictions have required the trial court to screen the hypnotic session to decide, as a matter of judicial discretion, whether it was so unduly suggestive as to undermine the reliability of incourt identification, under the totality of the circumstances. Thus, in *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386 (1983), the Supreme Court of Wisconsin rejected application of the *Frye* rule and applied instead a rule like that which has arisen to determine whether an out of court identification procedure was so suggestive as to deny due process under the Fourteenth Amendment. See Part II A, *post*.

Once admitted by the trial court, credibility of the hypnotically enhanced testimony may be attacked before the jury. See also *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984). The Supreme Court of Mississippi has determined that, subject to minimum mandatory guidelines, including the requirement of "otherwise admissible corroborating testimony or physical evidence which tends to substantiate the hypnotically-enhanced statements [,]" such statements are admissible and the factor of hypnosis be-

comes a matter of weight or credibility, for the jury to consider. *House v. State*, 445 So.2d 815 (Miss.1984). Other jurisdictions eschew the "guideline" approach as "improper and unworkable[,]" *Chapman v. State*, 638 P.2d 1280, 1285 (Wyo.1982), holding that "[t]he issue is properly one for the fact finder—as are all issues relative to the credibility of the witness," *id.*, at 1282, and that "[a]n attack on credibility is the proper method to determine the value of the testimony of a previously hypnotized witness," *id.*, at 1284. See also *State v. Brown*, 337 N.W.2d 138, 151 (N.D.1983); *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979).

**5.** See, e.g., *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982).

**6.** *Martinez v. State*, 437 S.W.2d 842, 848 (Tex.Cr. App.1969).

**7.** It is true that at one point in his direct examination Stricherz testified that "[t]he identification via the process of forensic hypnosis technique used by Travis McPherson [in the instant

was it argued to the trial court at the conclusion of the hearing that Ybarra's identification testimony ought to be excluded under a *Frye* analysis.

In his original brief to the court of appeals appellant raised only the Fourteenth Amendment issue and, as alluded to *ante,* the Sixth Amendment issue. Ironically, the question of "the use of hypnosis as a valid means to refresh the memory of a witness" was initiated by the State in its reply brief. Relying on the seminal case of *Harding v. State,* 5 Md.App. 230, 246 A.2d 302 (1968),[8] the State argued that the fact that Ybarra had been hypnotized prior to trial in an effort to enhance her memory of the offense was a matter going to the weight or credibility the jury might wish to attribute to her identification testimony in its deliberations, not to admissibility in the first instance. Seizing upon this opening, appellant filed a supplemental brief in the court of appeals, in which he argued for the first time that "given the use of the intrinsically unreliable hypnotically induced pretrial identification procedure, the incourt identification was rendered inadmissible as a matter of law. *People v. Shirley,* supra." Thus the *Frye* issue crept into the case.

The court of appeals reviewed a number of cases concerning application of the *Frye* rule in the context of what it considered to be exclusively a *constitutional* inquiry. The result is a somewhat confused analysis, that confusion being manifest in the court's observation "that the effect of the decisions of the courts that follow the strict safeguard approach and the *per se* exclusionary rule, is to extend to the accused greater rights than those provided by the United States Supreme Court in other investigative identification cases [footnote omitted]." *Vester v. State,* supra at 721.

Ultimately, utilizing those Supreme Court cases, the court of appeals concluded "that post-hypnotic identification testimony is admissible where the totality of the circumstances surrounding the hypnotic session shows the session was not so impermissibly suggestive as to give rise to a substantial likelihood of an unreliable [sic] or misidentification." *Id.,* at 722. Having found the May 18 hypnotic session not to have been so impermissibly suggestive as to taint Ybarra's incourt testimony, the court of appeals proceeded to conclude, in my view gratuitously if one is to accept the finding that the session was not suggestive in the first instance, that "the record reveals clear and convincing evidence that the prosecutrix's incourt identification was of independent origin." *Id.*

Notwithstanding that admissibility of Ybarra's identification testimony under a *Frye* analysis has been extensively briefed to this Court by appellant and by the Texas Criminal Defense Lawyers Association as *amicus curiae,* that issue *as such* is not presently before us. No objection was lodged on this basis at any time in the trial court. The court of appeals expressly limited its decision to the constitutional due process claim; hence, that is the only decision before this Court for review. Article 44.45, V.A.C.C.P. See *Lambrecht v. State,* 681 S.W.2d 614 (Tex.Cr.App.1984).

### D.

The majority also declines to decide "whether hypnotically induced testimony is admissible in Texas[,]" but for a markedly different reason, *viz:* that "[t]he fact that such testimony was admitted in appellant's case was not harmful, if indeed it was error

---

case] is a standardized valid approach in *investigative* hypnosis." However, the witness never explained what elements went into making that "approach" a "valid" one, nor did he establish that the field of forensic hypnosis constitutes the relevant scientific community for purposes of establishing reliability under *Frye.* Indeed, as we have noted, *ante,* the "videotape" theory of memory upon which many forensic hypnotists proceed has *not* gained general acceptance among psychologists. See also *People v. Shirley,*

supra, 641 P.2d at 798–801, 181 Cal.Rptr. at 266–269.

8. *Harding* has been overruled. *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983). Also relied on by the State, but since overruled, is *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978). See *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984).

at all, because it was merely cumulative of already reliable identification testimony." Maj. op. at p. 924.

As I understand it the majority thus reasons that because it has determined the May 18 hypnosis did not affect what Ybarra would have been able to testify to anyway, based upon her prehypnotic identification which the majority finds was reliable, the subsequent hypnosis contributed nothing new to the incourt identification, and thus did not "harm" appellant. Her posthypnotic testimony at trial was "cumulative" of what the majority finds she would have testified to had she never been hypnotized.

This of course ignores the thrust of appellant's assertion under *Frye*, an *evidentiary* rule, that the effects of hypnosis on the memory are so subtle and ineradicable that a witness whose memory has been so "refreshed" is rendered incompetent as a matter of law to testify as to any matter opened during the hypnotic session.[9] If we were to accept this assertion, then admission of Ybarra's identification testimony would constitute error regardless of how the chips might fall on the due process question.[10] While its present disposition of the due process issue may signal how the Court would ultimately resolve a *Frye* claim, it would not excuse the Court from undertaking the analysis, provided that claim were properly before the Court *as such*. Here it simply is not.

### E.

In resolving appellant's constitutional claim the majority opinion affirms the judgment of the court of appeals "while not expressly adopting its entire rationale." Slip op. at p. 9. Just what the majority has not adopted is unclear, since both it and the court of appeals conclude (1) that the hypnotic session was not unduly suggestive,

9. As noted in n. 3, *ante,* this is the rule enunciated in *People v. Shirley,* supra, now urged upon us by appellant.

10. The harmfulness of that error would then become an operative consideration, and we would look to see what evidence *other than* the

and that even if it was, (2) the incourt identification had an origin independent of whatever suggestiveness may have occurred.[11] Maj. op. at p. 923. It is to these holdings that I now turn.

### II.

### A.

A pretrial identification procedure may be so unnecessarily suggestive and conducive to mistaken identification that to use that identification at trial would deny the accused due process of law. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). However, it is the "substantial likelihood of misidentification" that may be engendered by such suggestive procedure that works the deprivation. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Thus, if the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed "reliable," "reliability [being] the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

To be weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances are the following nonexclusive factors: "The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. The *Manson*

contaminated witness' testimony tended to establish the accused as the culprit, and how decisively. See, e.g., *State v. Blanchard*, 315 N.W.2d 427 (Minn.1982).

11. As to this second holding, see n. 12, *post.*

Court found these factors set out in *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 375, 34 L.Ed.2d at 401, which in turn seems to have gleaned them from *United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149, 1165 (1967).[12]

### B.

In deciding that the May 18 session was not unduly suggestive the court of appeals focused on the conduct of Sheriff McPherson during Ybarra's hypnosis, and concluded: "After listening to the tape of the hypnotic session, we are not convinced that McPherson lead the prosecutrix to identify the appellant as the perpetrator of the crime, nor are we convinced that he did so by direct, indirect or subtle suggestions." *Vester*, supra, at 723.

Neither the court of appeals nor the majority opinion discusses what appear to me to be the relevant circumstances surrounding the hypnotic session. I now proceed to set them out as I gather them to be from reading the transcript of the pretrial hearings and listening to the tape of the session itself, a transcript of which does not appear in the record before this Court.

On April 8, 1979, approximately a week after the offense, Deputy Barclay showed Ybarra a photo array consisting of fourteen photographs. Barclay testified at the *Martinez* hearing that appellant's was "the picture that she stopped on out of the stack[,]" and that at this point the following exchange occurred:

"A: . . . And, She [sic] said something to the effect, 'That's him,' or, 'I think that's him,' and—or, 'That looks like him,' something like that.

And [sic] said, 'What do you mean that looks like him?'

And she said, 'That's him.'

And I said, 'Now, what do you mean?' I said, 'Are you positive?'

And she said, 'I'm almost positive.'

To the best of my memory that was it.

Q: So, she was almost positive but not positive?

A: Well, in my opinion what she was thinking, I don't know."

However, referring specifically to the photograph of appellant contained in the April 8 array, Ybarra herself agreed on crossex-

---

**12.** In *Jackson v. State*, 657 S.W.2d 123 (Tex.Cr. App.1983) this Court separately discussed admissibility of (1) testimony describing the out of court identification itself, and (2) the incourt identification that followed. In the former discussion we applied the *Manson* totality of the circumstances analysis to conclude that, even though the identification procedure had been unduly suggestive, there did not exist a substantial likelihood of misidentification. Therefore, it was held, due process did not compel the expulsion of the pretrial identification evidence.

Next the Court turned to the incourt identification, holding such testimony to be "admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification. [citations omitted.]" *Jackson*, supra, at 130. In my view this latter analysis is redundant.

Incourt identification could only be excludable if there occurred an unduly suggestive pretrial identification procedure that tainted it. If under the totality of the circumstances an unduly suggestive procedure nevertheless did not create a substantial likelihood of misidentification, there is no violation of due process in the first instance, and there can be no tainted incourt identification. It is gratuitous to then inquire after an "independent origin" for that incourt identification.

Independent origin analysis arose in a Sixth Amendment context. In *Wade*, supra, it was held that a violation of an accused's right to have counsel present at a postindictment, pretrial lineup would not result in exclusion of an identifying witness' testimony if the State could show, by clear and convincing evidence, that the incourt identification had a basis in observation independent of the lineup procedure. This Court has imported such an analysis into its due process cases, as *Jackson* illustrates.

What the Court really does, however, in resolving a Fourteenth Amendment claim by performing what it calls an "independent origin" analysis, is to *presume* for purposes of analysis that an unnecessarily suggestive pretrial identification procedure was conducted, but hold that even entertaining such *presumption*, no substantial likelihood of misidentification occurred when the *presumptively* suggestive procedure is weighed against the *Manson* factors (which *are* substantially the same as the factors in *Wade*, see citations in text, *ante*). Finding no denial of due process to have followed from the procedure itself, the Court then concludes the incourt identification is without taint, and finds it admissible.

amination that "the best [she] could do was to say that the features looked like the man." Appellant was not arrested at this point, not because Barclay was unsure of Ybarra's identification, but because he "wanted some additional evidence" before doing so.

On May 18, 1979, Ybarra was placed under hypnosis by Sheriff McPherson. In the course of the two hour session she was hypnotized, apparently with some difficulty, and asked to proceed step by step over the events of the afternoon and evening and through the offense itself. Under continual prompting by McPherson, Ybarra gave a narrative that is substantially identical to those she gave later at a habeas corpus hearing, at the *Martinez* hearing, and again at trial, as summarized in the court of appeals' and this Court's majority opinions.

At the *Martinez* hearing appellant advanced a theory of suggestiveness, based upon the transcript of the hypnotic session, that McPherson repeatedly exhibited to Ybarra a single photograph of appellant in an attempt to obtain a definite identification. The record does not bear out this theory, at least not entirely, and appellant abandoned it on appeal.

Twice during the hypnotic session Ybarra was asked repeatedly to close her eyes and picture the man who committed the killing, then to open her eyes and compare the picture in her mind with a "picture" that was exhibited to her. The first such episode took place in the middle of her narrative of the killing itself. However, both Barclay and McPherson testified that, while not certain, they believed the "pictures" exhibited to Ybarra at this point were from a "composite identikit," by which McPherson was attempting to make or verify a likeness of her assailant.[13] It

appears that no photographs were exhibited at this point.

Later, however, at the conclusion of her narrative, a similar ritual took place, except that this time Ybarra was asked to picture her assailant in her mind's eye, and then open her eyes and compare that picture to a photograph. McPherson had been given a five photo array which contained a different photograph of appellant than that in the April 8 photo spread. He exhibited these photographs in this manner, one at a time, to Ybarra. While each of the first four photographs were displayed thusly to her, Ybarra was asked if the man in the photograph was the same man she pictured in her mind. For each of these first four questions the tape reveals no audible answer, but, without delay, McPherson proceeded to the next photo as if he had received a negative response. Finally Ybarra was shown appellant's picture. A long pause ensued, after which Ybarra stated: "Looks like him." Immediately McPherson had her close her eyes again, and for a *sixth* time she was instructed to picture the assailant. On this occasion, however, she was told to:

"... look at him real good. Now I want you to put that face on a blackboard. This is nothing else but that man's face. The one that shot Robert. You see nothing else. Now, I want you to keep that blackboard blank, except for that face. Do you see it? You got it real good? Okay. Now, I want you to look. You have got to put that man's face up there. You can see him? No? Okay. Now I want you to go deeper and deeper, deeper and deeper. Deeper and deeper. Do you see him, see that face—see his face? Now, I want you to put this picture right beside it. Is that the same picture as the picture in your mind?"

13. Prior to the *Martinez* hearing McPherson had not reviewed the tape of the session, but had only read the transcript. During his testimony at trial, where the fact of hypnosis was reasserted in order for the jury to determine the weight to give Ybarra's testimony, McPherson revealed that since the *Martinez* hearing he had listened

to the tape, and *was* certain that the "picture" displayed to Ybarra at this juncture was indeed the composite identikit. It still was not clarified whether the composite picture was *made* during the May 18 hypnotic session, or had been made by Ybarra earlier and was being compared to her hypnotic "memory."

It is difficult to discern her answer to this last question, although it certainly isn't hard to imagine her response.[14]

McPherson continued:

"Is that the man who shot Robert? The picture I had in my hand, is that the man? You don't have to be afraid. If it is him, you say, 'yes,' if it is not you say, 'no.' You don't have to be afraid. Just relax. Do you think that is the man? Did you see any of those pictures that look like the man—look like that man?"

Ybarra's responses are inaudible. Finally McPherson instructed:

"When it comes time to identify this man, you will be able to see him, and you will be able to pick him out, because you will remember those eyes. Can you see those eyes? Now, you are going to have to look at a line-up at several men, and you will be able to pick this man out, the man who shot Robert ... [15] so I want you to identify the man when you see him."

At this point Ybarra was awakened. Deputy Barclay, Texas Ranger Joe Hunt and DPS polygraph operator Ron Rogers had been observing the session from an adjoining room via a two way mirror. After Ybarra was awakened, one or all of these officers entered the room. Ybarra was then shown the *April 8* photo array again and asked if she could identify "the man who shot Robert." She was told, "... you are going to be able to. It is just very easy for you to do." After a pause Ybarra responded, "It is that man. It looks like him," or words to that effect, apparently referring to appellant's photograph. After another brief pause she asked: "Is that the same one?" One of the officers responded, "It's just an older picture."

### C.

Appellant now asserts that by having Ybarra place "that face on a blackboard" immediately after she had tentatively iden-

tified appellant's photograph ("Looks like him"), and then reinforcing that connection by having her view the photograph a second time, McPherson indelibly printed appellant's visage in her mind as the perpetrator of the offense. In pressing this argument appellant refers us to the *Frye* cases, which in turn rely heavily on the scientific literature, see Part IA, *ante.*

Viewing McPherson's conduct in the context of the literature, it is possible to conclude that some suggestion occurred. Certainly McPherson did not deliberately set out to suggest to Ybarra that she should positively identify appellant. In fact, as the majority observes, McPherson was unaware appellant was a suspect when the session began. Even after Ybarra stated that the fifth photograph "looked like" her assailant, McPherson was careful not to tell her to place *appellant's* picture on the imaginary blackboard; rather, he instructed her to place the face of "the man who shot Robert" there, and compare *that* with the photograph of appellant. However, the cues that trigger confabulation or reliance upon "memories so vague and fragmentary that [the subject] would not have relied on them before being hypnotized" are usually unintentional and frequently imperceptible. The very fact that the subject has been hypnotized in order to make or confirm an identification may be enough. See Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* supra, at 333; Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?,* 38 Ohio State L.J. 567, 578 (1977).

Immediately after Ybarra again tentatively identified appellant under hypnosis (the first time having been when Barclay showed her a different photo of appellant in the photo array of April 8), McPherson instructed her for the first time to imagine a blackboard and place "that face" on it. Again he showed her appellant's photograph. Ybarra testified at the *Martinez*

---

**14.** At trial McPherson testified that she answered, "Yeah."

**15.** A lineup was indeed held, but not until February of the following year. Not surprisingly, Ybarra picked out appellant.

hearing that when she had said "It looks like him" she had meant:

"A: That I couldn't say it was him or not, I said, 'It looks like him.'

Q: What about the second time?

A: I was sure it was him."

It seems eminently possible that, under the influence of hypnosis, Ybarra perceived that McPherson wanted her to give up any doubt she may have entertained that appellant was "the man who shot Robert." Focusing thus on the susceptibility of Ybarra, rather than the deliverateness of McPherson, one might well conclude that the hypnosis was used, albeit inadvertently, to suggest to Ybarra that she positively identify appellant. The trial court, however, found otherwise.

### D.

Usually a determination of suggestiveness must be made on the basis of the totality of circumstances surrounding the complained of identification procedure, viewed in light of common sense. It is common sense that informs that a one man showup is inherently suggestive, especially under circumstances implying to the witness that the police believe they have found their man. See, e.g., *Jackson v. State*, 657

S.W.2d 123 (Tex.Cr.App.1983). Likewise common sense dictates that a lineup containing five stocky short men and one wiry six foot suspect is suggestive. As the discrepancies are diminished, the judgment becomes more difficult, but that judgment is still predicated on simple common sense. That hypnosis may be inherently suggestive as a means of obtaining an identification, however, does not lend itself readily to a common sense determination. There are those who would believe, as noted in Part IA, *ante*, that an identification obtained through hypnosis will invariably be accurate. While the scientific literature almost uniformly discounts this belief, the uninformed layman (or trial judge) does not necessarily know this. Evidence of the potential for confabulation, reduction of critical judgment or the like should be presented to the trial court so that it may make its factual determination on the issue of suggestiveness in that context.

The instant trial court, however, was not provided the full panoply of scientific evidence preparatory to its ruling on appellant's suppression motion.[16] Instead the court heard only the testimony from the two "expert" witnesses, Dr. Cronson, for appellant, and psychologist Stricherz, on

16. In *People v. Shirley*, 641 P.2d at 797, 181 Cal.Rptr. at 265, the California Supreme court explained the reason it is appropriate for an appellate court to consider the scientific literature in the context of a *Frye* analysis, thus:

"The Attorney General complains that 'literature is not evidence,' and that it would be improper for this court to 'pick and choose among that literature to decide issues of scientific fact.' The remark betrays a fundamental misunderstanding of the task before us: our duty is *not* to decide whether hypnotically induced recall of witnesses is reliable as a matter of 'scientific fact,' but simply whether it is generally accepted as reliable by the relevant scientific community....

\* \* \* \* \* \*

... The courts view such writings as 'evidence,' not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community. Nor do the courts 'pick and choose' among the writings for this purpose. On many topics—including hypnosis—the scientific literature is so vast that no court could possibly absorb it all. But there is no need to do so, because the burden

is on the proponent of the new technique to show a scientific consensus supporting its use; if a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose that use of hypnosis as unreliable, the court may safely conclude there is no such consensus at the present time." [Emphasis in original]

The Court then proceeded to review the literature and to identify the dangers of using hypnosis as a memory refresher, as reflected therein. See Part IA, *ante*.

In the instant case the trial court was called upon to rule *specifically* on the suggestiveness, if any, of the May 18 hypnotic session on Ybarra's identification of appellant—*not* on the consensus of opinion in the scientific community regarding the reliability of hypnosis as a memory catalyst. It would be inappropriate to import conclusions of the scientific literature into our evaluation of the trial court's determination of the ultimate fact issue, *viz:* whether this particular hypnotic session was impermissibly suggestive. Rather, that determination should be reviewed in light of evidence presented to the trial court at the *Martinez* hearing.

behalf of the State. Both witnesses testified that their training and experience were primarily in the field of therapeutic hypnosis, although Stricherz had previously "used hypnosis in criminal investigations."

Dr. Cronson testified that in his opinion the May 18 hypnotic session was "suggestive and biased," at least "regarding the identification:"

"A: I thought that the procedure was too tedious and smacked of pressuring the patient, the client.

Q: And what do you mean by pressuring the patient?

A: I felt there were an awful lot of leading questions.

Q: What is the danger of leading questions?

A: If you ask leading questions, you will get the answer you ask for, because if a person is at all suggestable, they will—they will be aware of what you are revealing to them, or what you want to reveal."

Though Cronson had reviewed the transcript of the taped hypnotic session, he listened to only an undesignated portion of the tapes. It appears that he subscribed to the theory advanced by appellant's counsel that McPherson had displayed a single photograph of appellant to Ybarra over and over, each time asking "is this the one?" [17] Cronson also testified that exhibiting pictures to a hypnotic subject one at a time is more suggestive than laying them out, since the potential for cueing is greater; and that exhibiting a photograph which the subject had tentatively identified previously would tend "to make the [subject] want to identify that person," "especially since it was a police officer interviewing her" in a law enforcement ambience. On crossexamination Cronson recognized that "investigative hypnosis is a valuable tool for the use in discerning truth," so long as the hypnotist is not "biased."

The State's expert, Stricherz, while apparently cognizant of at least some of the dangers of hypnosis, nevertheless found no suggestiveness at work in the May 18 session:

"Q: Let me give you a hypothetical situation in which a person had made a positive identification prior to being put under hypnosis and prior to hypnosis being induced. In that situation, would that in itself, the fact that she had identified a particular individual, and then was later put under—or induced into a hypnotic state, would that in itself create a suggestion if she were showed a group of photographs in which the same person was present in that group of photographs at the subsequent hypnosis session, such that the identification could not be trusted?

A: That in itself would probably not be the case.

Q: Assume further that in that same situation that the hypnotic expert or the forensic hypnotist in a situation did not have any idea as to who she had identified before, or who in this particular group of photographs in the hypnotic session was a suspect in this particular situation, is there any way that he could transfer or suggest to her any particular photograph when he didn't have any idea who she had identified before and any idea of who the police were even looking for in the current context?

A: Yes. There are ways in which that could be done.

Q: Based on your review of this situation, do you have an opinion based on our experience in the field of investigative hypnosis as to whether or not that occurred in this situation?

A: After listening to the tapes, looking at the transcripts, listening to his tone of voice, his inflections, it appears to me that there was not an indirect suggestion put into the ver-

---

17. It was not until he testified at trial that Cronson became aware that the first exhibition of "pictures" to Ybarra had involved the composite identikit.

bal interchange between Travis and Edelia during that hypnotic session."

On this state of the record, based upon the evidence presented to the trial court at the *Martinez* hearing, I would hold that the court was justified in concluding the May 18 hypnotic session was not impermissibly suggestive. The specific theory of suggestiveness raised on appeal was never brought to the attention of the trial court, much less substantiated by Dr. Cronson's testimony. The trial court was within its discretion as factfinder in accepting Stricherz' assessment, for what it was worth, over that of Dr. Cronson.

Having concluded thus that the May 18 hypnotic session was not shown to be suggestive, I find it altogether unnecessary to look for an "independent origin" for Ybarra's incourt identification.[18] See *Williams v. State*, 675 S.W.2d 754, 757 (Tex.Cr.App. 1984).[19] Because the court of appeals' and majority opinions do so anyway, I venture a few observations as to the problems courts may encounter applying the *Manson* factors in a case where hypnotic suggestion *has* been found to have occurred.

### E.

Assuming appellant had established suggestiveness, it would be necessary to inquire whether, under the totality of the circumstances, there was a substantial likelihood of misidentification, weighing the corrupting effect of the suggestive identification procedure against the factors set out in *Manson*, supra. These factors are not exclusive, but are intended to be exemplary of the kinds of considerations relevant to determining whether a witness' memory of the culprit was sufficiently definite prior to the suggestive procedure that the procedure itself in all probability could not have altered it. When it is shown that an identification was obtained or enhanced through hypnosis, however, the efficacy of some of

the *Manson* factors for making this determination may come into question.

The majority emphasizes the opportunity Ybarra had at the scene to observe her assailant and to focus her attention on him. Unfortunately, apart from police testimony not elicited until trial of the lighting conditions on the night of the offense, the only testimony describing Ybarra's opportunity to observe her assailant came from Ybarra herself, subsequent to her having "relived" the episode under hypnosis. Any confabulation or credence given to false or fragmentary memory could well have been cemented in Ybarra's posthypnotic memory and regurgitated (indeed, honestly believed) by Ybarra on the witness stand. In short, Ybarra's description of her opportunity to observe may be as infected as her identification testimony. It is therefore problematical, to say the least, to rely on Ybarra's testimony of how closely, how well, how long, etc., she observed her assailant as evidence of the reliability of her incourt identification of appellant.

More troubling still is the majority's reliance on "unequivocal statements made at the suppression hearing and at trial showing the independent origin of [Ybarra's] in-court identification." Maj. op. at p. 924. Such unequivocal statements are exactly what one would expect to hear from a witness who has been instructed, under hypnosis, to relinquish all doubt as to who he believes might be the culprit. As a result of post hypnotic source amnesia, the witness may well have forgotten, by the time of trial, that he ever harbored doubt to begin with. One cannot take such statements at face value; they are as indicative of hypnotic suggestion as of any origin independent thereof.

Finally, and primarily, the majority relies on Ybarra's identification of appellant from the April 8 photo array, conducted prior to the hypnosis; an identification which Ybarra herself characterized at the *Martinez*

---

18. See n. 12, *ante.*

19. "Since no impermissibly suggestive pretrial procedure was employed, we need not address

appellant's contention the pretrial procedure resulted in a substantial likelihood that [the] incourt identification of him was in error."

hearing as having been tentative. However, this fact, too, strengthens as much as rebuts the notion that the *positive* identification at trial was a product of suggestiveness during hypnosis. Pressured to make an identification, a hypnotic subject is more likely than not to choose a familiar face and positively identify it—even if in actuality he never saw that face before tentatively identifying it in a previous, albeit *un* suggestive, photo spread.

In short, the totality of circumstances has not been considered *unless* the nature and effect of hypnosis upon memory has been taken into account, not only in assessing suggestiveness, but also in applying the *Manson* factors to determine reliability of an incourt identification in light of that suggestiveness. It must be reiterated, however, that the trial judge in the instant case was not well enlightened in this regard—a deficiency which must militate against appellant, since he shoulders the burden of demonstrating suggestiveness. Had he been educated, the judge may well have concluded, after listening to the tapes of the hypnotic session, that the session resulted in a substantial likelihood of misidentification, and that Ybarra's incourt testimony was therefore inadmissible. I, for one, would then be inclined to agree.

For reasons stated I concur in the judgment of the Court in affirming the judgment of the court of appeals, but do not join the Court's opinion.

MILLER, J., joins.

TEAGUE, Judge, dissenting.

The majority makes the following holdings:

... The circumstances presented in the record before us reveal that the pre-trial identification process was not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Furthermore, the record reveals clear and convincing evidence that the prosecutrix's in-court identification was of independent origin. It follows, therefore, that the prosecutrix's in-court identification of appellant is reliable.

The majority thus avoids reaching the primary issue in this cause, namely, whether hypnotically-induced testimony is admissible in Texas. See, however, *Burnett v. State*, 642 S.W.2d 765, 769 (Tex.Cr.App. 1983), in which this Court implicitly joined the majority of the States that evidence obtained as a result of hypnosis should not ever be admissible evidence because it is scientifically unreliable.

Notwithstanding that I believe that the issue, whether evidence obtained as result of hypnosis should ever be permitted in Texas, should be addressed, I am unable to agree with the above statements the majority makes.

I find that appellant's counsel, in his petition for discretionary review, has pointed out several facts which the majority apparently does not deem significant, although I do. I point out that the Hon. Hollis M. Browning, the assistant district attorney who filed the State's reply brief to appellant's petition for discretionary review, did not take issue with any statements of fact that appellant's counsel presents in his brief. Because I find that appellant's counsel has adequately set out in the petition for discretionary review he has filed facts which I believe show what is clearly wrong with the majority opinion, I take the liberty of copying much of what he has stated.

Deputy Barclay, whose hearsay testimony forms the sole basis for the conclusion that the prosecutrix had identified appellant a week after the offense and more than a month before she underwent hypnosis, testified that he showed the prosecutrix a stack of photos, out of which, *Barclay said,* she identified appellant's photograph. However, Barclay made no report of the fact that the prosecutrix had either tentatively or positively identified appellant's photograph. Although Barclay testified that he had talked with both the District Attorney and his first assistant about the prosecutrix's identification, each of them denied any such conversation ever occurred, asserting that had Barclay told

them that the prosecutrix had positively identified appellant as one of her assailants, and the killer of her companion, charges would have been filed against appellant.

The prosecutrix herself testified that she could not remember when she first identified a photograph of appellant. She testified that it was Deputy Keesee, *not Barclay*, who showed her a stack of photographs a week after the offense. She also testified that she was not positive when she first saw appellant's photograph. She testified: "He looked different in that picture." It was an "old picture." She testified she could not remember whether she saw the "old picture" when she was hypnotized or just after the time of the offense.

I find that appellant's counsel has hit the nail on the head when he states the following: "The 'old picture' is the key, and when it is placed in context, it becomes obvious that while the prosecutrix may have been shown photographs prior to the hypnotic session (she says she was not), she made no identification until Sheriff McPherson showed her [appellant's] photograph and told her he was the one that shot Robert [the prosecutrix' male companion who was murdered]. Then she was awakened and shown another picture, and when she hesitated, someone said it was 'just an older picture' ... In other words, both photo display identifications occurred on May 18, in the context of the hypnosis session. The prosecutrix' own testimony puts both identifications in that context, while her testimony that Deputy Keesee showed her the pictures a week after the offense, and that he laid them out on a table, contradicts Barclay's testimony that he showed them, in a stack, as she sat on the front seat of a vehicle. Moreover, Barclay's failure to produce a report of the identification impeaches his testimony that the identification occurred at all, and the testimony of the District Attorney and his first assistant, that Barclay never reported to them that the prosecutrix had made a positive identification of [appellant] destroys anything that might remain of his credibility."

From the above, it should be obvious to anyone that the hypnotic session the prosecutrix underwent clearly tainted her in court identification of appellant.

I must ask the majority: If what it states is actually what happened, namely, "Approximately one week after the incident, Deputy Barclay requested the prosecutrix to look through a group of pictures to determine if there was a photograph of either of the two men in the stack. She went through the stack and stopped at the appellant's picture. She responded, 'That's him,' or 'I think that's him,' 'That looks like him,' or words to that effect. The deputy then asked her, 'What do you mean that looks like him?' She answered, 'That's him.' The deputy further inquired, 'Are you positive?' She said, 'I'm almost positive,'" then pray tell, why did the authorities of Lubbock County go to the expense, time, and trouble to obtain the services of a self-taught hypnotist from another county?

If one goes solely by the record, but because of the many, many discrepancies and contradictions, if not downright falsehoods in his testimony, I find it difficult that anyone, much less a majority of this Court, would put any stock whatsoever in Barclay's testimony. In the trial, Barclay's testimony was reduced to the equivalent of zero evidence. Therefore, it was not entitled in the trial court, nor is it entitled in this Court, to any weight whatsoever. The majority opinion does a disservice to honorable and professional law enforcement personnel of this State by relying upon Barclay's testimony in order to sustain the appellant's conviction.

For the above and foregoing reasons, I respectfully dissent.